HAZARD KNOWLES ET AL. *v.* JOHN NICHOLS, JR.

A Committee, appointed by the General Assembly to lay out a tract of land, belonging to the State, into such a number of farms as [might enable the State to sell the same to the best advantage, and to make a survey thereof, and report to the General Assembly at the next session, made their report accordingly, accompanied by a plat, by which it appeared that they had divided the land into six lots numbered on the plat, excepting a tract of marsh, which they had apportioned undivided to the several lots, and excepting a lot of about ten acres, adjoining the beach, which they had laid out as a " common lot," and that they had laid out a driftway to the marsh and across the corner of the marsh, so that every lot might have free access to the marsh and to the " common lot ;" and said Committee were, thereupon, authorized to sell the said farm or tract of land in separate *divisions or lots, according to the* said plat, and the General Treasurer empowered, upon payment of the purchase money, to execute, to the purchasers of said lots, deeds conveying an estate of inheritance in fee simple ; and said Committee reported, at the next session, that they had sold the farm in lots agreeable to the plat, and presented an account of sales, from which it appeared they had sold the lots with the undivided shares of marsh apportioned to each, but making no mention

Knowles et al. *v.* Nichols.

of any sale of the common lot. Said "common lot" having been inclu-
ded within the boundaries contained in one of the deeds executed by the
General Treasurer, it was held; that the General Treasurer had authori-
ty to convey to the grantees only such lots as were sold by the Committee,
and that there had been no sale of said common lot; that to carry out the
intention of the General Assembly to make the said lot a common for all
the purchasers of the estate sold, it was not necessary that the State
should part with the fee, and if a right of common in said lot had been
sold to the purchasers of said estate, yet the deed of the common lot
would not make the grantee a trustee of said lot for the other purchasers,
inasmuch as it was a conveyance in fee simple, and could not be construed
to give any right to any person not named in it.

The facts are sufficiently stated in the opinion of the
Court.

*Dixon and Shearman* for the defendant, contended.
The General Treasurer only had authority to execute
conveyances of the lots sold by the committee. This
ten acre lot is not comprised in the report of sales which
the committee made to the General Assembly. The
boundaries in the General Treasurer's deed amount to
nothing, unless they conform to the plat of the commit-
tee. This was the plat agreeably to which the sales
were made. On this plat, the ten acre lot is set off for a
common. It was not sold, and was evidently intended
to be retained by the State as a common, not for the
Sewall farm, but for the whole State, and it could be
sold by the State now. It is said that this lot was to be
common to the owners of the Sewall farm; and was
conveyed to Cook and Irish as trustees for them; but
the Treasurer had no authority to do this, in as much as
he was restricted to giving deeds of the lots, as sold ac-
cording to the plat.

*Ames and Updike* for the plaintiffs, to show that the proceedings of the General Assembly and the committee might be referred to, to ascertain the intention of the General Assembly with regard to the " common lot," cited *Klinan* v. *Cook*, (1 Sh. & Lefroy, 32.) *Sanderson* v. *Jackson*, (2 Bos. & Pul. 238.) *Hodges* v. *Horsford*, (1 Russel & Milnes 116,) and contended. If the plaintiffs have the legal title to this " common lot," it matters not whether they hold it for themselves, or as trustees for others. The ground of this action is, that this land is held by the plaintiffs by the terms of their deed, and according to the plain intent of the General Assembly. The boundaries of the deed embrace this land ; so that we avoid the technical difficulties of the former suits, but we are met by another objection, viz : that the committee did not sell, and the General Treasurer had no authority to convey the common lot. By the Act of June, 1784, a committee was appointed to survey, lay out and plat the Sewall farm, and report to the General Assembly. They made their report in August, 1784, accompanied by a plat. On this plat the common lot is laid out. The proceedings under this plat are to be construed according to the plain intent of the parties. It would be impossible to draw a deed with such variety of reference, as this has, free from every technical objection. What was the intent here ? The farm was to be marked out in such a way that the most favorable terms could be got from purchasers. The ten acre lot of beach was laid out as a common lot, and a drift-way opened to it. It is said the lot is common to the State. The committee were appointed to plat the Sewall farm for sale in such a way as would be most for the benefit of the purchasers and the State. The whole farm was surveyed

and platted, divided into lots, the marsh land distributed to the upland, and the ten acre lot laid out as a common lot. They were then to sell the whole farm according to plat; not simply to give to purchasers of lots Nos. 1, 2 and 3, the lots but all the privileges, which the plat annexed entitled them to. Are we to presume they have violated their duty ? When they report they have sold according to plat, are we to suppose that they have not so done ? You do not find in the report any express mention of the common lot and pond, but when you look at the plat you find that these were made appuertenances of the lots sold. The question is, whether the general treasurer has executed the conveyances of this land in pursuance of his authority. He has not done it in a technical way, but he has done it, so as to carry out the intent of the General Assembly. The deed to Cook and Irish, was the last of the deeds made ; the former deeds contained references to the plat ; the land conveyed in this, was co-terminous with the " common lot." What is the plain meaning of the grant ? Sale was made and title was to be given of the whole farm ; and, yet, the legal title of the common lot still remained in the State. Inasmuch as the land was to be conveyed, what so natural as to vest it in Cook and Irish, on whose land it bounded. They would thus become the trustees and legal protectors of the rights of the purchasers of the Sewall farm. The State wished to divest itself of all title ; and how can you explain the words of this deed and carry out the intent of the General Assembly, except by this construction, and this construction does perfectly carry it out. The acquiescence of the State for sixty-five years in the claims of the purchasers confirms this construction. The claims of citizens generally amount to noth-

ing, because a right to take profits from the land of another cannot be acquired by custom.

BRAYTON, J., delivered the opinion of the Court.

The present action was trespass for breaking and entering the close of the plaintiff, called and known by the name of the "common lot," as marked down on the plat of the Sewall Farm, and carrying therefrom the plaintiff's seaweed, sea-drift or manure.

The plea interposed by the defendant was the general issue, in which the plaintiff joined issue.

The defendant admitted his entry upon the premises and carrying away a quantity of sea-weed therefrom, as alleged in the plaintiff's declaration, but put the plaintiffs to prove their possession. No proof was offered of any actual possession or occupation by them, but they proceeded to put in proof of title to the premises in question, and, thereby, to prove a constructive possession of the close, no other person having been in possession.

And the question in the cause was that of title.

The facts put in evidence, in support of title, on the part of the plaintiff were, that the close in question was originally a portion of a farm, formerly owned by Samuel Sewall, which, prior to 1784, had been confiscated.

At the June Session 1784, the General Assembly appointed a committee to lay out the Point Judith farm, so called, into such a number of farms and lots as may enable the State to sell the same to the best advantage of the State and the purchasers, and to make a survey thereof, and report to the General Assembly at the next session."

At the August Session of the General Assembly, the Committee reported, " That on the 9th of August, 1784,

they repaired to the said farm, first causing a survey to be made, and then divided the same into six lots, (the marsh excepted,)" and stating the manner, " and also numbered each lot and entered the quantity of acres it contains on our plat." " We have assigned unto each of the lots, Nos. 1, 2 and 3, two ninth parts of said salt marsh, and to each of the lots, Nos. 4, 5 and 6, one ninth part of said marsh ;" and, after describing the highway laid out, proceed, " We have, also, laid out a lot of about ten acres, on the south side of the marsh adjoining the sea and beach, for a common, and laid out a drift-way," describing it, " to the marsh and across the corner of the marsh, so that every lot may have free access to the marsh and to the common lot."

This report was accompanied by the plat, from which it appeared that lot No. 1, contained 200 acres ; No. 2, 200 acres ; No. 3, 243 acres ; No. 4, 139 acres ; No. 5, 125 1-2 acres, and No. 6, 116 1-2 acres ; the marsh undivided, 122 acres ; the common lot, 10 acres.

This report was accepted and the committee were at the same session authorized and appointed " to sell the said farm or tract of land, in separate divisions or lots, agreeable to the said plat."

And it was also voted, " That on payment of the purchase money into the General Treasury, the General Treasurer is hereby directed and empowered to execute unto any and every of the purchasers of the said lots a deed, conveying unto the said purchasers an estate of inheritance in fee simple with warranty."

In October following, the Committee reported to the General Assembly that they had sold the farm in lots, agreeable to the plat, and, herewith. present the account of sales as follows :—

| | | | |
|---|---|---|---|
| To Nathan Kenyon, | lot No. 6, | 116 1-2 | acres. |
| "        " | marsh, | 13 1-2 | " |
| To John Cook, | lot No. 5, | 125 1-2 | acres. |
| "   " | marsh, | 13 1-2 | " |
| To John Cook, | lot No. 4, | 139 | acres. |
| "   " | marsh, | 13 1-2 | " |
| To Nathan Kenyon, | lot No. 3, | 243 | acres. |
| "     " | marsh, | 27 1-9 | " |
| To Mathew West, | lot No. 2, | 200 | acres. |
| "     " | marsh, | 27 1-9 | " |
| To Nathan Kenyon, | lot No. 1, | 200 | acres. |
| "     " | marsh, | 27 1-9 | " |

Neither the report nor the account of sales mentions the common lot.

The report was accepted.

The lot No. 6, struck off to Nathan Kenyon, by a subsequent vote of the General Assembly, was directed to be conveyed to John Cook, he paying the purchase money, and the lot struck off to West to be conveyed to J. Pollen, by agreement between him and West.

On the 13th of March, 1787, the General Treasurer executed a deed for and on behalf of the State, (referring to the Act of the General Assembly for his authority in these words ; " by virtue of and by force of an act of the General Assembly thereof,") to John Cook and George Irish, and describing the land conveyed thus : "three certain tracts or parcels of land together with three tracts or parcels of marsh, therewith apportioned, being numbered four, five, and six, situate in South Kingstown in Washington County in this State aforesaid, upon the southernmost part of Point Judith point, which

were late part and parcel of the estate of Samuel Sewall, and which became forfeit, the whole containing in upland and marsh four hundred and twenty-one acres and eleven eighteenths of an acre, of which fifty acres and two-thirds of an acre is marsh land." The description of the land and the boundaries include not only lots Nos. 4, 5, and 6, but the ten acre lot, laid out for a common, being the lot now in question.

Irish conveyed his undivided half to Hazard Knowles, describing the estate, as in General Treasurer's deed.

Cook also conveyed his undivided half by the same description to the said Hazard Knowles.

Hazard Knowles by his last will and testament made in 1823, devised to his grandsons, the present plaintiffs, "One hundred and thirt-nine acres of land more or less, now in their possession, being lot No. 4 on the Point Judith farm, so called, lying and being in South Kingstown, sold by the State committee, and, also, a lot of beach of ten acres, called Sand Hill cove, running from land of the late of William H. Knowles to the old beach." This again is the common lot on the plat.

There is no question but that the title in the State was perfect, so that the plaintiffs have derived, by the deeds of Cook and Irish, and by the will of Hazard Knowles, whatever title to the common lot passed by the deeds of the General Assembly to Cook and Irish.

The only question is, whether the title of the State to the common lot passed to Cook and Irish, by the deed of the General Treasurer.

The defendant claims that, so far as relates to the common lot, nothing passed by the deed, because Joseph Clarke, the General Treasurer, not being the owner of the

Sewall farm or any part thereof, or of any interest therein, had no power to execute any deed of the premises or any portion of them, except by virtue of and in accordance with the authority conferred upon him, for that purpose, by the resolution of the General Assembly, at the May session, 1784, before referred to.

That in and by that resolution, he is empowered to convey to the purchasers only such lots as may have been sold by the committee, and for which the purchase money had been paid into the Treasury. That as to the common lot, the report does not state, nor is there any other proof, that the Committee ever sold it or that any money was paid into the treasury for it.

The plaintiff's counsel argued that the deed to Cook and Irish comprehended the common lot and by its terms passes the estate to them, and it is immaterial whether to them as trustees for the other purchasers of the Sewall farm lots or not.

That the deed refers to the proceedings of the General Assembly, and that, therefore, the deed and proceedings of the General Assembly and the committee are to be so construed, as to carry out the intent of the parties, apparent from them; that from them, it appears that the whole Sewall farm was to be surveyed and divided into lots for sale; the committee were ordered to sell the whole agreeably to the plat made and returned. They reported that they had sold agreeably to the plat, to do which, they must have sold the whole; that the common lot, laid off on the plat and marked common, was intended for the use of all the purchasers, and as the deeds to Cook and Irish were the last conveyances executed by the General Treasurer, the common lot was conveyed to them in order to complete the conveyance of the whole Sewall estate, which they were to hold as trustees.

The plaintiff's counsel claims, that from the resolutions of the General Assembly, the plat and reports of the committee, the intent was to convey the common lot for the use of all the farm lands, and that the deed must be construed according to that intent, and the Court are bound to give effect to the instrument, as a deed of trust for the use of all, because they are referred to for authority to the Treasurer to convey.

Now the deed itself clearly conveys to the grantees an estate in fee in their own right ; " to have and to hold to them and their heirs and assigns forever, to their only proper use, benefit and behoof forever." The words have a definite meaning, are clear and admit of no doubt. The deed must be construed by its own language, for it is that selected by the parties. The question is not what the parties intended, aside from the deed, but what interest the language of the deed conveys. No other terms can be substituted, whatever might have been the intent. Without such such substitution, there can be but one construction to the deed, and that it gives no right to any person not named in it. *Kenyon* v. *Nichols,* (1 R. I. Rep. 411.)

The deed, however, makes no reference to anything, for the terms on which the estate is to be held or for the description of the estate conveyed, but simply refers to the act of the General Assembly for the authority to convey. We cannot, therefore, go out of the deed for any other purpose.

If, then, the Treasurer had power to convey in trust he has not so conveyed.

But, had he any power to convey the common lot ? For his authority, he refers in his deed to the act of the

General Assembly. For this purpose, we may properly consider all the resolutions of the General Assembly, in relation to the sale and the doings of the Committee, since the act conferring the authority on the Treasurer, is part and parcel of the act authorizing the committee to sell.

By the vote he is directed "to execute to any and every of the purchasers of the said lots a deed, &c." These are the operative words of the vote, giving him any authority to convey. The authority is given in reference to a contemplated sale by the committee of the Sewall farm, in separate lots agreeable to the plat. The committee were first to make the contract of sale, and the treasurer on receipt of the purchase money, was to complete the contract by executing a deed to the purchaser. Until the committee made a sale he could not convey. His power was to be exercised in this contingency. He could not himself sell. Until the committee sold he could not act. He could convey no more than they sold.

Did they sell the common lot ? To ascertain this, we must look to the acts of the committee and inquire, whether they sold in point of fact, not whether it was in contemplation of the General Assembly that they should sell, or whether the committee themselves intended to sell.

Were we to look at what the General Assembly and the committee intended, in relation to the common lot, we could find nothing in aid of the treasurer's authority.

The lot is marked on the plat " common lot," and is referred to in one of the deeds, by the same term, and in their report of partition of the farm.

Now this term, " common," by no rules of interpretation, can be construed to mean a lot to be held by several

as *tenants in common ;* but as a lot, in which several are to have common of some sort. Now this would not contemplate a sale or conveyance of the fee. Such conveyance would be unnecessary.

And if it were the intent to grant a right of common in the lot, it was an interest to be sold and conveyed, and might be, equally well, whether the title remained in the State or become vested in an individual.

What that right of common was to be, does not appear, and we are left entirely to conjecture what was contemplated by the General Assembly or the Committee. It might have been for sea-weed, for beach-weed. for pasture, and we cannot intend a conveyance of the fee in order to pass either the one or the other of these rights of common or the whole, because it is not necessary for that purpose, and would pass more than was intended or contemplated.

But, in point of fact, the committee sold neither the fee of the common lot nor any right of common or other interest in it. The report, made by them, states plainly what was sold, the persons to whom, the number of acres and the prices, at which they sold the several parcels.

No mention is made of any sale of the 10 acres, marked common lot, or of any easement or right of common therein, to any person, or that it was offered for sale. The deed does not show any consideration paid either for the title to the fee or the common.

This is all the evidence of what was sold, which we have to determine the fact by, and we are left without any evidence that any interest whatever in the common lot was sold.

It would seem from the survey and plat, and the report of the committee of that survey, that this lot was to be common, that the owners of the farms sold were to have a right of common of some kind in this lot, that the right of common was to be sold and conveyed, whatever it was, and perhaps was intended to be included in the sale of the several lots. It does not appear that such right was put up, with either of the parcels of land, reported to be sold, or by itself.

Whatever the intention was, it was one which was never carried into effect either by sale or by conveyance.

The contingency, then, upon which the power to convey was to be exercised by the General Treasurer, has not happened, and he was not warranted in including the common lot in the conveyance to Cook and Irish.

*Judgment for defendants.*